*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* SHELLY ANN-MARIE SANGSTER, R.N.

---

DEPARTMENT OF LICENSING AND
REGULATORY AFFAIRS,

Petitioner-Appellee,

v

SHELLY ANN-MARIE SANGSTER, R.N.,

Respondent-Appellant.

FOR PUBLICATION
January 13, 2022
9:05 a.m.

No. 352147
LARA Bureau of Professional
    Licensing
LC No. 19-004634

---

Before: MARKEY, P.J., and SHAPIRO and RONAYNE KRAUSE, JJ.

PER CURIAM.

Respondent Shelly Ann-Marie Sangster, R.N., appeals by right the order of the Board of Nursing Disciplinary Subcommittee (BNDS) revoking respondent's nursing license on the basis of MCL 333.16221(a) (violation of general duty) and (b)(*vi*) (lack of good moral character). We affirm.

## I. FACTS

### A. BACKGROUND

Respondent was a registered nurse but had not been employed in that capacity since 2012. This case arises from a relationship that respondent cultivated with a 75-year-old man, FL. FL died prior to the hearing on this matter; therefore, the facts were derived from the testimony of FL's two adult daughters, FL's doctor, respondent, and an investigator who interviewed FL prior to his death. FL's wife of more than 50 years died suddenly shortly before the events that gave rise to this case, and at all relevant times FL was suffering from a terminal form of cancer.

FL was addicted to gambling and frequently patronized a local casino. FL and respondent met in 2016 while both were gambling at the casino, and respondent moved into FL's home shortly

-1-

after the two met. FL's daughters testified that immediately after meeting, respondent told FL that she was a nurse, that she was homeless, and that the pair could assist one another. Respondent, however, testified that such a conversation never occurred and that FL offered to let her stay with him because he knew that she did not have a home and that she did not want to move back in with her mother. Respondent claimed that she then became a sort of "home assistant" for FL and helped him with cleaning, cooking, shopping, and other household chores. But FL's daughters as well as FL's doctor testified that respondent held herself out as FL's caregiver and that her status as a nurse gave her substantial credibility with FL in this regard.

It is undisputed that FL spent substantial sums of money while respondent was living with him and that FL added respondent to a checking account as well as to multiple lines of credit. One of FL's daughters testified that FL spent approximately $40,000 on respondent, although she did not supply any documentation to verify that figure. Respondent admitted that FL spent a lot of money purchasing clothes and other necessities for her, and she also acknowledged that he paid her a few hundred dollars a week for her services. But respondent denied that she "swindle[d]" him for money or gifts, insisted that the checking account and lines of credit were established so that she could purchase groceries for FL, and stated that most of the money FL lost during that time was the result of his gambling addiction.

FL had hopes of forming a romantic relationship with respondent, but those feelings for her were unreciprocated. Respondent testified that toward the end of her time living with FL, he began making romantic advances, and she therefore decided that it was time for her to move out. FL's daughters testified that around this time respondent took FL's car and left him stranded at a hotel for multiple days. FL called them when this happened, and he did not know where he was or what to do. One daughter testified that while respondent was gone with FL's car, respondent visited an ATM and took approximately $1,000 from the joint checking account she shared with FL. Respondent testified that she was given permission by FL to take his car so that she could move out of his house.

After this incident, FL moved in with one of his daughters, and she helped him obtain a personal protection order (PPO) against respondent. This daughter also initiated protective proceedings to establish a guardianship and conservatorship over FL, and respondent was held in contempt of court for violating the PPO by attending the guardianship hearing. FL lived with his daughter until his death, and she testified that FL felt as though respondent had taken advantage of him. In 2018, FL was interviewed by an investigator from the licensing board about his relationship with respondent. The investigator's testimony largely corroborated the testimony of FL's daughters, and she stated that FL felt embarrassed about what had happened.

## B. PROCEDURAL HISTORY

On December 28, 2018, petitioner, the Michigan Department of Licensing and Regulatory Affairs (LARA), through the Director of the Bureau of Professional Licensing, filed an administrative complaint against respondent, alleging that respondent was subject to discipline under MCL 333.16221(a) (violation of general duty), (b)(*iii*) (mental or physical inability to practice in safe and competent manner), and (b)(*vi*) (lack of good moral character). Petitioner also issued an order of summary suspension, and on March 5, 2019, respondent filed a petition for

dissolution of summary suspension. After multiple adjournments, the details of which are not relevant to this appeal, a hearing on the complaint was held on August 26, 2019. On October 15, 2019, the hearings examiner issued a proposal for decision in which he found that respondent had violated MCL 333.16221(a) and (b)(*vi*) but not (b)(*iii*). On November 3, 2019, respondent filed exceptions to the proposal for decision, and on December 16, 2019, the BNDS entered a final order in which it adopted the hearings examiner's findings of fact and conclusions of law. As punishment for the statutory violations, the BNDS revoked respondent's nursing license.

## II. ANALYSIS

### A. STANDARDS OF REVIEW AND OVERVIEW OF DISCIPLINARY PROCEEDINGS

Rulings by disciplinary boards or subcommittees are reviewed on appeal solely under Const 1963, art 6, § 28. *Dep't of Community Health v Anderson*, 299 Mich App 591, 597; 830 NW2d 814 (2013); *Dep't of Community Health v Risch*, 274 Mich App 365, 371; 733 NW2d 403 (2007). Const 1963, art 6, § 28, provides:

> All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record.

This Court must review the entire record, not just the portions that support an agency's findings, when assessing whether the agency's decision was supported by competent, material, and substantial evidence on the whole record. *Risch*, 274 Mich App at 372. "Substantial evidence" means evidence that a reasonable person would find acceptably sufficient to support a conclusion. *Id*. This may be substantially less than a preponderance of evidence, but does require more than a scintilla of evidence. *Id*. The *Risch* panel further observed:

> Moreover, if the administrative findings of fact and conclusions of law are based primarily on credibility determinations, such findings generally will not be disturbed because it is not the function of a reviewing court to assess witness credibility or resolve conflicts in the evidence. A reviewing court may not set aside factual findings supported by the evidence merely because alternative findings could also have been supported by evidence on the record or because the court might have reached a different result. [*Id*. at 372–373 (citations omitted).]

"Under th[e] test, it does not matter that the contrary position is supported by more evidence, that is, which way the evidence preponderates, but only whether the position adopted by the agency is supported by evidence from which legitimate and supportable inferences were drawn." *McBride v Pontiac Sch Dist (On Remand)*, 218 Mich App 113, 123; 553 NW2d 646 (1996). "[A]n appellate court must generally defer to an agency's administrative expertise." *Anderson*, 299 Mich App at 598. For purposes of Const 1963, art 6, § 28, a decision is not "authorized by law" when it is in violation of a statute or a constitutional provision, in excess of

an agency's statutory authority or jurisdiction, made upon unlawful procedure that results in material prejudice, or when it is arbitrary and capricious. *Northwestern Nat'l Cas Co v Comm'r of Ins*, 231 Mich App 483, 488-489; 586 NW2d 563 (1998).

With respect to a due process argument raised by respondent, it presents a question of constitutional law that we review de novo. *People v Nunley*, 491 Mich 686, 696-697; 821 NW2d 642 (2012). Unpreserved constitutional arguments are reviewed for plain error affecting substantial rights. *In re Osborne*, 237 Mich App 597, 606; 603 NW2d 824 (1999).

MCL 333.16221 lists a number of violations or grounds that can result in disciplinary proceedings against a licensee. In pertinent part, MCL 333.16221 provides:

> Subject to section 16221b, the department shall investigate any allegation that 1 or more of the grounds for disciplinary subcommittee action under this section exist, and may investigate activities related to the practice of a health profession by a licensee, a registrant, or an applicant for licensure or registration. The department may hold hearings, administer oaths, and order the taking of relevant testimony. After its investigation, the department shall provide a copy of the administrative complaint to the appropriate disciplinary subcommittee. The disciplinary subcommittee shall proceed under section 16226 if it finds that 1 or more of the following grounds exist:
>
> (a) Except as otherwise specifically provided in this section, a violation of general duty, consisting of negligence or failure to exercise due care, including negligent delegation to or supervision of employees or other individuals, whether or not injury results, or any conduct, practice, or condition that impairs, or may impair, the ability to safely and skillfully engage in the practice of the health profession.
>
> (b) Personal disqualifications, consisting of 1 or more of the following:
>
> * * *
>
> (*vi*) Lack of good moral character.

MCL 333.16231 authorizes the issuance of a complaint against a licensee for an alleged violation of MCL 333.16221. And MCL 333.16231a provides for a hearing on the complaint before a hearings examiner. At the hearing, the licensee "may be represented . . . by legal counsel." MCL 333.16231a(4). The hearings examiner "shall determine if there are grounds for disciplinary action under section 16221 . . . ." MCL 333.16231a(2). The hearings examiner must "prepare recommended findings of fact and conclusions of law for transmittal to the appropriate disciplinary subcommittee." *Id*. "In imposing a penalty . . ., a disciplinary subcommittee shall review the recommended findings of fact and conclusions of law of the hearings examiner." MCL 333.16237(1). Under MCL 333.16237(3), "[i]n reviewing the recommended findings of fact and conclusions of law of the hearings examiner and the record of the hearing, a disciplinary subcommittee may request the hearings examiner to take additional testimony or evidence on a specific issue or may revise the recommended findings of fact and conclusions of law as

determined necessary by the disciplinary subcommittee, or both." A disciplinary subcommittee is not permitted to conduct its own investigation or to take its own additional testimony or evidence. *Id.* MCL 333.16237(4) provides:

> If a disciplinary subcommittee finds that a preponderance of the evidence supports the recommended findings of fact and conclusions of law of the hearings examiner indicating that grounds exist for disciplinary action, the disciplinary subcommittee shall impose an appropriate sanction . . . . If the disciplinary subcommittee finds that a preponderance of the evidence does not support the findings of fact and conclusions of law of the hearings examiner indicating that grounds exist for disciplinary action, the disciplinary subcommittee shall dismiss the complaint. A disciplinary subcommittee shall report final action taken by it in writing to the appropriate board or task force.

When a disciplinary subcommittee finds the existence of one or more of the grounds set forth in MCL 333.16221, the subcommittee is authorized under MCL 333.16226 to impose various sanctions against a licensee. And MCL 333.16226(2) provides:

> Determination of sanctions for violations under this section shall be made by a disciplinary subcommittee. If, during judicial review, the court of appeals determines that a final decision or order of a disciplinary subcommittee prejudices substantial rights of the petitioner for 1 or more of the grounds listed in section 106 of the administrative procedures act of 1969, MCL 24.306, and holds that the final decision or order is unlawful and is to be set aside, the court shall state on the record the reasons for the holding and may remand the case to the disciplinary subcommittee for further consideration.

## B. DISCUSSION

Respondent first argues that the BNDS lacked jurisdiction to hear this case because there was no nexus between respondent's relationship with FL and the practice of a health profession. We disagree.

As indicated earlier, MCL 333.16221 provides, in pertinent part, that LARA "shall investigate any allegation that 1 or more of the grounds for disciplinary subcommittee action under this section exist, *and* may investigate activities related to the practice of a health profession by a licensee, a registrant, or an applicant for licensure or registration." (Emphasis added.)[1] Pursuant to these *two* types of investigatory powers, LARA "may hold hearings, administer oaths, and order the taking of relevant testimony." MCL 333.16221. Although LARA has the authority or jurisdiction to investigate and have a subcommittee hold hearings in relation to activities connected to the practice of a health profession, it also has the authority or jurisdiction to investigate any allegations of a violation set forth in MCL 333.16221, followed by a subcommittee hearing on the matter. Jurisdiction existed in this case because there were allegations premised on various

---

[1] The BNDS is an entity within LARA and its Bureau of Professional Licensing.

grounds found in MCL 333.16221. LARA and the BNDS were presented with allegations that respondent used her status as a registered nurse to exploit and defraud FL. Respondent's arguments regarding this issue pertain to the strength of the evidence supporting the allegations; however, those arguments have no bearing on whether LARA had the authority to investigate the allegations in the first place and lodge an administrative complaint or on whether the BNDS had jurisdiction to conduct a hearing, assess the evidence, and render findings concerning the allegations. In other words, the jurisdiction of the BNDS depended on the nature of the allegations, not upon the truth of those allegations.

Respondent next argues that the hearings examiner committed error warranting reversal by admitting hearsay testimony. We disagree.

Petitioner contends that respondent failed to preserve this argument. An issue is preserved if it has been "raised before, addressed by, or decided by the lower court or administrative tribunal." *Gen Motors Corp v Dep't of Treasury*, 290 Mich App 355, 386; 803 NW2d 698 (2010). While respondent did not raise an objection to every instance of alleged hearsay testimony, respondent did raise a hearsay objection early in the proceeding and the hearings examiner indicated that he did not intend to exclude evidence on the basis of hearsay. Therefore, we conclude that the hearsay issue was adequately preserved.

" 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." MRE 801(a).

Substantial portions of the evidence admitted and considered by the hearings examiner constituted hearsay. Specifically, respondent challenges the testimony of FL's daughters, the investigator, and FL's doctor. FL's daughters testified in regard to what FL told them about his relationship with respondent and how she left him stranded at a hotel. The doctor also testified with respect to what FL told him regarding FL's relationship with respondent. Finally, the investigator testified about an interview that she conducted with FL to discuss respondent's conduct. Petitioner does not dispute that this testimony was hearsay, that it did not fall within any hearsay exception, and that it would not have been admissible in an ordinary criminal or civil trial.

Nevertheless, the fact that the hearings examiner admitted hearsay does not necessarily mean that the examiner erred. Section 75 of the Administrative Procedures Act of 1969, MCL 24.201 *et seq*., provides, in relevant part:

> In a contested case the rules of evidence as applied in a nonjury civil case in circuit court shall be followed as far as practicable, *but an agency may admit and give probative effect to evidence of a type commonly relied upon by reasonably prudent men in the conduct of their affairs*. Irrelevant, immaterial or unduly repetitious evidence may be excluded. Effect shall be given to the rules of privilege recognized by law. . . . [MCL 24.275 (emphasis added).]

In light of the "reasonably prudent men" standard in MCL 24.275, "[i]t is now established that evidentiary rulings in administrative proceedings may stray from rigid courtroom rules on

evidence." *Rentz v Gen Motors Corp, Fisher Body Div, Fleetwood Plant*, 70 Mich App 249, 253; 245 NW2d 705 (1976).

In this case, strict adherence to the Michigan Rules of Evidence was not practicable because FL died before the hearing. Therefore, the only way that the hearings examiner could consider FL's version of events was to admit hearsay evidence in the form of testimony from the people to whom FL had described his relationship with respondent. Given MCL 24.275, the dispositive issue is whether reasonably prudent men in the conduct of their affairs would have relied on the hearsay testimony.

The hearings examiner had ample reason to conclude that the evidence was sufficiently reliable to warrant admission. The evidence was not far removed from the source as each witness was repeating information that had been relayed directly to them by FL, who had experienced the events firsthand. FL moved in with one of his daughters after he stopped living with respondent, and the daughter testified that she spent "almost every day" with him from that point until his death. Therefore, she had the opportunity to become quite familiar with FL's perspective on his interactions with respondent. The investigator and the doctor were neutral and had no incentive to skew FL's words. We are aware of no information that substantially undermines the credibility of these witnesses and conclude that a reasonably prudent person would have relied on the hearsay testimony. Moreover, respondent merely argues in conclusory fashion that a reasonably prudent person would not have relied on the hearsay testimony but fails to proffer any reasons for that conclusion. Reversal is unwarranted.

Respondent next argues that the hearings examiner erred by ruling that she lacked good moral character for purposes of MCL 333.16221(b)(*vi*). We disagree. Petitioner argues that respondent failed to preserve this issue. But respondent's continuous position below, both at the hearing and in the exceptions to the proposal for decision, was that petitioner failed to establish the statutory grounds for revocation of her license, including lack of good moral character. Therefore, this issue is preserved. See *Gen Motors Corp*, 290 Mich App at 386.

"The phrase 'good moral character', when used as a requirement for an occupational or professional license[,] . . . means the propensity on the part of an individual to serve the public in the licensed area in a fair, honest, and open manner." MCL 338.41(1); see also *Bureau of Health Professions v Serven*, 303 Mich App 305, 310; 842 NW2d 561 (2013) (applying MCL 338.41[1] to an allegation made under MCL 333.16221[b][*vi*]).

The following excerpt from the hearings examiner's findings summarizes the conduct of respondent that demonstrated a lack of good moral character in the view of the examiner:

> The facts in this case are truly disturbing. Shortly after meeting at a casino, Respondent found herself living in F.L.'s home, driving his car and commandeering his finances. Although Petitioner failed to provide a record demonstrating the precise dollar amount, F.L.'s daughters credibly testified that Respondent may be responsible for spending up to $40,000 in funds from F.L.'s credit cards and accounts. The credible testimony on this record also shows F.L. felt embarrassed and victimized after he realized he had been taken for a ride when he reported to [the investigator] how Respondent caused him to lose thousands and thousands of

dollars. . . . [T]he investigator . . . was a disinterested witness who offered objective and very credible testimony.

The evidence was sufficient for a reasonable person to conclude that respondent used her status as a nurse to exploit FL for her own personal and financial benefit. FL's daughters testified that FL was terminally ill and that he had been struggling emotionally since the sudden death of his wife. FL's daughters also testified that respondent told FL shortly after meeting him that she was a nurse and that they could help each other. One daughter indicated that respondent's status as a nurse gave her credibility with FL as a caregiver. FL's doctor testified that when he met respondent at one of FL's appointments she held herself out as his caretaker. FL's daughters asserted that respondent allowed FL to make frequent and extravagant purchases for her and estimated that FL spent close to $40,000 on respondent. Even presuming that some of the $40,000 that disappeared from FL's funds probably went to gambling rather than to respondent, respondent admitted that she was added to FL's financial accounts and that she allowed FL to purchase coats, clothing, and other necessities for her. A daughter testified that she spent virtually every day with FL after respondent stopped living with him, that she obtained insight into the situation, and that respondent appeared to be using her nursing license to exploit FL. She emphasized that respondent always presented herself as being FL's healthcare person, indicating "that she was taking care of his health." As noted earlier, FL's daughters testified that respondent once abandoned FL without a car at a hotel for multiple days and took more than $1,000 of FL's money from an ATM. The investigator testified that FL told her that respondent held herself out as FL's caregiver, and he also informed the investigator about the incident in which he was abandoned at a hotel.

Respondent's testimony directly contradicted substantial portions of the testimony offered by petitioner's witnesses. But the hearings examiner found that "[r]espondent's version of the events was inconsistent, illogical, and largely self-serving" and that "[t]he testimony from F.L.'s daughters, [the doctor,] and [the investigator], on the other hand, were more consistent, logical and reasonable, which made their testimony more credible than Respondent's." This Court generally does not disturb findings that are based on credibility determinations, and we do not reverse factual findings merely because there were other findings that the evidence could have supported. *Risch*, 274 Mich App at 372-373. The record supported a conclusion that respondent lacked the propensity "to serve the public in the licensed area in a fair, honest, and open manner." MCL 338.41. Accordingly, there was substantial, competent, and material evidence supporting the determination of the hearings examiner that respondent lacked good moral character.

Finally, respondent argues that her due-process rights were violated because the revocation of her license was based on the state's disapproval of an unconventional but consensual relationship. We disagree. Respondent contends that her license was revoked because her "non-mainstream" relationship with FL was viewed as "inappropriate or morally unacceptable" by the state of Michigan. Respondent cites *Lawrence v Texas*, 539 US 558, 562; 123 S Ct 2472; 156 L Ed 2d 508 (2003), for the proposition that the state was not entitled to do this because "consenting adults have an absolute right to engage in private relationships of their choosing, where, as here, there is no evidence of the violation of any law." We agree that a mutually consensual relationship that causes no harm and no violation of the law would be an impermissible basis for revoking respondent's license, but the hearings examiner found that the relationship was exploitative and harmful to FL. Respondent's argument essentially is that the hearings examiner's findings were erroneous, that respondent's interpretation of the evidence was that she and FL had a consensual

and mutually beneficial, while also unconventional, relationship, that this Court should accept her interpretation of the evidence rather than the examiner's, and that, in light of her interpretation of the evidence, the state had no right to revoke her license. But for all the reasons discussed above, the evidence was sufficient to support the hearing examiner's findings. Therefore, we decline respondent's invitation to substitute her interpretation of the evidence and likewise reject her constitutional argument.

We affirm.

/s/ Jane E. Markey
/s/ Douglas B. Shapiro
/s/ Amy Ronayne Krause